**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**



**Dated: February 11, 2010**

_____
**JOHN C. AKARD
UNITED STATES BANKRUPTCY JUDGE**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | CASE NO. 09-13407 |
| FERNANDO A. PINEDA and ) | |
| MAGDALENA S. PINEDA ) | CHAPTER 11 |
| ) | |
| Debtors ) | |

**MEMORANDUM OF OPINION**

**on Mr. & Mrs. Carr's Motion for Relief from Stay**

On February 8, 2010, the court held a hearing on the Motion for Relief From Stay brought by Kenneth D. Carr and Amy Jill Carr (the Carrs) against Fernando A. Pineda and Magdalena S. Pineda (the Debtors) concerning the house at 905 Oak Ridge Circle, Austin, Texas[1] which is legally described as:

---

[1] In the documents and in the testimony the Property is also referred to as 909 Live Oak Ridge, Austin, Texas.

> Lot 16 MAYO ADDITION, a subdivision in Travis County, Texas according to the map or plat thereof recorded in Volume 70, Page 95 of the Plat Records of Travis County, Texas. (the Property)

At the conclusion of the hearing, the court granted the motion. This memorandum will amplify the reasons for the decision given on the record.

## FACTS

The Debtors purchased the Property from the Carrs in January 2007 for $1 million. The Debtors paid $160,000 as a down payment and executed a note dated January 31, 2007 to the Carrs for $840,000 (Carrs' Exhibit 1). The note was secured by a Deed of Trust on the Property (Carrs' Exhibit 2). The note bears interest at 6% per annum. It provided for 23 monthly payments of $5,036.22 each beginning 31 days after the date of the note, with the balance of the note becoming due on the "first day of the twenty-fourth month after the Loan Date" (which the parties agreed was January 31, 2009). The debtors made some monthly payments, but did not make all of the required monthly payments.

The note provides for an extraordinary payment by January 1, 2008 if the Debtors sold a house at 3935 Linden, Long Beach, California by that date. The Debtors did not sell the house by that date and the extraordinary payment was not made.

The parties entered into an Agreement to Extend Payment of Real Estate Lien Note signed March 5, 2009, but effective as of February 1, 2009 (attached to Carrs' Exhibit 1). The agreement recited that the Debtors did not pay the principal balance and accrued interest on January 31, 2009 and that they were in arrears on the monthly payments on the note in the amount of $26,078.13. It further recited that by adding the arrearage to the principal balance of the note, that as of March 1, 2009, the principal balance of the note was $848,554.80. The agreement extended the maturity date of the note to July 31, 2009 and the Debtors agreed to resume monthly payments on the note at the original amount beginning with the month of February 2009. The Debtors made some of the monthly payments, but the evidence indicates that they did not make all of them.

The due date of the note was informally extended to December 31, 2009. Apparently the Debtors did not make any payments on the note after July 31, 2009.

On December 1, 2009, the Debtors filed this case for a reorganization under Chapter 11 of the Bankruptcy Code. In the schedules, the Debtors listed the house in Long Beach, California at $900,000 subject to a lien of $826,312.85 and the Property at a value of $1,015,450 subject to liens of $934,494.36. They valued their personal property at $87,332.84. The Property is claimed as their exempt homestead and most of the personal property is claimed as exempt.

The schedules reflect a debt of $40,000 to the Travis County Tax collector for taxes on the Property. The lien to the Carrs is listed at $894,491.36. The Debtors state that they

owe $19,255.01 in taxes to the Internal Revenue Service, which debt is entitled to priority under the Bankruptcy Code and an additional $2,068.00 to the Internal Revenue Service which is not entitled to priority.

The schedules reflect unsecured debts of $1,110,100.21 consisting principally of large credit card debts, loans from individuals, and a $124,000 judgment held by the MGM Grand Hotel. One of their children has serious medical problems and a number of medical providers are listed as creditors, but the total medical debt is not large when compared to the credit card debt.

The Debtors' statement of income and expenses shows that their monthly income is $17,836.00 and their monthly expenses are $17,988.22 for a net loss of $150.22 per month. These statements include a $5,036.22 payment on the Property and payment of the liens on the California house, but do not include any payments to other creditors. The testimony revealed that the California house is rented for less than the monthly mortgage payments on the house.

Testimony at the hearing revealed that as of July 21, 2009 the debt to the Carrs totaled $838,799.07 and accrued interest to February 2, 2010 was $79,902 making a total due as of February 2, 2010 of $918,701.07 upon which sum interest is accruing at the default rate of 18% per annum. As of the hearing date, the unpaid taxes on the Property totaled $42,631.93 upon which interest and penalties are accruing at the statutory rates.

Mr. Pineda and Mr. Carr were the only persons to testify at the hearing. Mr. Carr has been a licensed Real Estate Broker for a number of years, concentrating in commercial real estate. The Carrs now live in Fredericksburg, Texas. He stated that he was not familiar enough with the residential real estate market in Austin, Texas to give an estimate of the value of the Property. He offered unconverted testimony that, because trees had been cut on the Property, the market value had been reduced. He estimated that because of trash left from the tree removal and because the Property had not otherwise been maintained, it would take $15,000 to $20,000 to clean up and repair the property in preparation for a sale.

Mr. Carr also testified that if the property were sold for $ 1million, a 6% real estate commission would be standard and other sales expenses would be approximately 1% of the sale price, resulting in a 7% sales cost; namely $70,000.

Mr. Pineda testified that he thought the property was worth approximately $ 1 Million. The Debtors' Exhibit 1 is a statement from the Travis County Appraisal District which states that the property has an assessed value of $926,046 and a total value of $1,015,450.

Mr. Pineda is a commission salesman. His testimony indicates that at the time the Property was purchased, he was engaged principally in the sale of greeting cards to retailers. He testified that his major supplier cut him off, thus preventing him from making sales. He stated he is making efforts to get another supplier. The Debtors own 80% of In Motion Design, LLC. (Motion Design) The income reflected in their schedules is from that source, where he is an officer and she is a sales associate. Mr.

3

Pineda stated that Motion Design was developing a line of novelty items to be sold to 7-Eleven stores. Debtors' Exhibit 4 consists of three redacted pages of a print out of account activity at Chase Bank. Mr. Pineda testified that those pages relate to Motion Design. The only items shown were a December 8, 2009 deposit from 7-Eleven, Inc. for $39,540, a January 7, 2010 deposit from 7-Eleven, Inc. for $6,960 and a deposit on February 2, 2010 for $7,000 which Mr. Pineda testified was from 7-Eleven. Mr. Pineda is quite optimistic that 7-Eleven will purchase a great many more items from Motion Design and that, as a result, the Debtors will be able to make a payment of $5,036.22 to the Carrs "in March."

Another concern of the Carrs was that the Property was not insured. Debtors' Exhibit 3 is a computer printed document entitled "Evidence of Insurance," which states that the Property is insured by a homeowner's policy for $750,000. The policy was issued January 31, 2010 and is for one year. Mr. Pineda stated that he was paying approximately $300 per month for the policy.

Mr. Carr testified that Mr. Pineda told him at the time of sale in 2007 that the Debtors would either refinance the Property or sell it by the due date of the note, then by the due date of the written extension, and then by the due date of the oral extension. The Debtors did not list the property for sale. Mr. Pineda said he did not want a "for sale" sign on his home. He stated that he had tried to refinance the property but gave no specifics.

**Discussion**

A review of the schedules in this case indicates that the motivation for filing this case was solely to retain the Property. The Debtors' statements of income and expenses show income which they hope to receive. The testimony indicates that they have not received income in that amount since they purchased the Property in 2007. But, even assuming they receive the large income shown in the income statement, they still do not meet the payment on the Property and their other expenses by $150.22 per month. Thus, while going into further debt each month, they would have nothing to pay on their federal tax obligations or on their more than $ 1 million of unsecured debt.

In substance, the Debtors cannot afford the Property. Their list of creditors reflects a lavish lifestyle. It is time for the Debtors to face up to the fact that they must find less expensive housing and reduce their lifestyle. As with all good salesmen, Mr. Pineda is very optimistic. Indeed, the court hopes that his projections of income come true, but for several years the Debtors have not had that income and they must use their future income to pay for their past lavish lifestyle.

Chapter 11 of the Bankruptcy Code is available to persons with large amounts of debt to reorganize their lives and to pay their creditors. The very essence of reorganization is to reduce the living expenses and to carve out a substantial monthly payment for the old debts. The Debtors in this case must do so.

**Statute:** The Carrs' motion is brought under § 362 of the Bankruptcy Code (11 U.S.C. § 362). That section provides what is referred to as the Automatic Stay, which stops actions by creditors against property of a debtor. Creditors (the Carrs in this case) can ask to be relieved from that stay in order to proceed with their state law remedies against property of the debtor. In deciding this matter, the court must be guided by § 362(d) which reads:

> (d) On request of a party in interest and after notice and a hearing, the court **shall** grant relief from the stay provided in subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay ---
>     (1) for cause, including lack of adequate protection of an interest in property of such party in interest:
>     (2) with respect to a stay of an act against property under subsection (a) of this section, if –
>         (A) the debtor does not have an equity in such property; and
>         (B) such property is not necessary to an effective reorganization.
> (emphasis added)

With respect to § 362(d)(1), the court finds that cause exists for the following reasons:
- The note payable to the Carrs has fully matured and they are entitled to foreclose on the Property under state law. The fact that the Carrs granted the Debtors two extensions to try to sell or refinance the Property does not destroy the fact that the full amount of the note is overdue and the Debtors are unable to pay it; nor did the extensions destroy the Carrs' rights to foreclose on the Property under state law.
- Mr. Pineda asserted that he could "adequately protect" the Carrs by making a payment to them of $5,036.22 "in March." He did not specify a date in March, so the payment he proposed could be made from 21 to 52 days after the hearing. That argument must fail because:
    - The note is fully due. The only way the Carrs can be adequately protected is for the note to be paid in full.
    - In effect, the Debtors are seeking to refinance the note so that they can pay it over a long number of years, but the Carrs are entitled to insist on the original terms.
    - Based on the testimony and evidence, the offer of the $5,036.22 in March is hollow and cannot be relied upon. The Debtors have made numerous promises to pay that amount every month, but they have not done so. In this case, promises are no longer a substitute for payments.
    - The income which the Debtors hope to receive is speculative, at best. The payments from 7-Eleven shown on the Debtors' Exhibit 4 are to Motion Design, a corporation; not to the Debtors. There is no information on the costs of the items sold or the costs of doing business for that corporation, so there is no way to predict how much, if any, of those amounts would be payable to the Debtors.
    - Even if the amounts on Debtors' Exhibit 4 are payable to them, the amounts are not sufficient. There is no evidence that the Debtors paid anything to the Carrs in December 2009, in spite of the recitation on

5

> Exhibit 4 of a payment from 7-Eleven of $38,540. The payments of $6,960 in January and $7,000 in February come nowhere near the $17,988.22 which the Debtors say they need each month.
> - Certainly Mr. Pineda is hopeful that the corporation will receive more money in February and March, but neither the court nor the Carrs can rely on such speculation.

With respect to § 362(d)(2)(A), the court finds that the Debtors do not have equity in the Property. As of the date of the hearing, the amount due on the note was $918.701.07, which amount is accruing interest at 18% per annum. The amount due for taxes secured by a lien on the Property was $42,631.93, which amount is accruing interest and penalties at the statutory rates. Thus, on the date of the hearing the total due on liens on the Property was $961,333.00. Expenses to put the Property in condition for sale are at least $15,000 and the expenses of sale would be $70,000. Those items bring the charges against the Property to $1,046,333. The Austin Central Appraisal District values the property at $1,015,450. It is common knowledge that the real estate market is depressed from its 2007 values, so it is likely that the property could not be sold for the Appraisal District value. In any event, the Debtors have no equity in the Property.

With respect to § 362(d)(2)(B), the court finds that the Property is not necessary to an effective reorganization. As noted above, the Debtors' budget including a $5,036.22 payment to the Carrs, is negative and provides no payments to the Internal Revenue service and to the unsecured creditors. The Debtors must reduce their housing and other expenses to be able to propose a feasible plan of reorganization.

For these reasons, the court relieved the automatic stay of § 362 to allow the Carrs to foreclose on the Property.[2]

# # #

---

[2] The court announced its decision at the conclusion of the hearing. Through clerical error, the order relieving the automatic stay was routed to Judge Gargotta, who signed the order on February 8, 2010.